IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAMES RAY DAVIS,

               Plaintiff,

    v.

STATE OF OREGON, et al.,

               Defendants.

No. CV 07-635-AC

OPINION & ORDER

**MOSMAN, J.**,

On May 5, 2009, Magistrate Judge Acosta issued Findings and Recommendation ("F&R") (#52) in the above-captioned case recommending that defendants' Motion for Summary Judgment (#37) and plaintiff's Motion for Partial Summary Judgment (#42) be DENIED. Plaintiff (#57) and defendants (#56) filed objections to the F&R. For the reasons discussed below I DENY defendants' Motion for Summary Judgment (#37) and GRANT plaintiff's Motion for Partial Summary Judgment (#42).

**STANDARD OF REVIEW**

The magistrate judge makes only recommendations to the court, to which any party may file written objections. The court is not bound by the recommendations of the magistrate judge, but retains responsibility for making the final determination. The court is generally required to

PAGE 1 - OPINION & ORDER

make a *de novo* determination of those portions of the report or specified findings or

recommendation as to which an objection is made. 28 U.S.C. § 636(b)(1)(C). However, the

court is not required to review, under a *de novo* or any other standard, the factual or legal

conclusions of the magistrate judge as to those portions of the F&R to which no objections are

addressed. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985); *United States v. Reyna-Tapia*, 328

F.3d 1114, 1121 (9th Cir. 2003). While the level of scrutiny under which I am required to review

the F&R depends on whether or not objections have been filed, in either case, I am free to accept,

reject, or modify any of the magistrate judge's F&R. 28 U.S.C. § 636(b)(1)(C).

## DISCUSSION

Judge Acosta's analysis follows a sequence set forth by defendants (collectively "the

State") in their Motion for Summary Judgment (#37). (F&R (#52) 5-6.) Both parties and Judge

Acosta agreed that four essential questions should be resolved in the following sequence: (1) Did

Mr. Davis's settlement of his habeas case release future claims? (2) By agreeing to a release date

in the settlement, did Mr. Davis agree that this new release date was proper under Oregon

Revised Statute ("ORS") § 137.370? (3) Because this claim implicates the validity and duration

of Mr. Davis's sentence, does *Heck v. Humphrey*, 512 U.S. 477 (1994), require that it be pursued

via habeas petition, or does it fit within the exception carved out by the Ninth Circuit in *Nonnette*

*v. Small*, 316 F.3d 872 (9th Cir. 2002)? (4) Was the Oregon Department of Correction's

("ODOC") sentence calculation correct under ORS § 137.370?

I disagree with this order of decision and with some of Judge Acosta's conclusions made

during his analysis. First, I hold that ODOC improperly calculated Mr. Davis's sentence under

ORS § 137.370. Second, the settlement does not constitute an agreement by either the State or

PAGE 2 - OPINION & ORDER

Mr. Davis that Mr. Davis's actual release date was proper under ORS § 137.370.  Third, I hold

that Mr. Davis's settlement agreement with the State, if valid, unambiguously waives any claims

arising from the dispute at issue, i.e., waives this § 1983 action.  However, a genuine issue of

material fact exists regarding whether Mr. Davis's settlement agreement is valid.  Fourth, if the

settlement is valid, there is no need to determine whether *Heck* or *Nonnette* applies; if the

settlement is not valid, *Nonnette* applies.  Thus, I GRANT Mr. Davis's Motion for Partial

Summary Judgment (#42) and DENY the State's Motion for Summary Judgment (#37).

## I.    Calculation of the Sentence Under ORS § 137.370

ORS § 137.370 states in relevant part:

> (2) . . . for the purpose of computing the amount of sentence served the term of
> confinement includes only: (a) The time that the person is confined by any
> authority after the arrest for the crime for which sentence is imposed; . . . (4) A
> person who is confined as the result of a sentence for a crime or conduct that is
> not directly related to the crime for which the sentence is imposed . . . shall not
> receive presentence incarceration credit for the time served in jail towards service
> of the term of confinement.

Or. Rev. Stat. § 137.370(2)-(4).  Essentially subsections (2)(a) and (4) are opposite sides of the

same coin; a defendant gets credit for incarceration as a result of the arrest for the crime for

which the sentence is imposed, Or. Rev. Stat. § 137.370(2)(a), but does not get credit if the arrest

for was a different crime or different conduct, *id.* § 137.370(4).  Judge Acosta found *State ex rel.*

*Curry v. Thompson*, 967 P.2d 522 (Or. Ct. App. 1998), unhelpful because it analyzed only

subsection (4).  However, because subsections (2)(a) and (4) are essentially looking at the same

question, whether time spent in incarceration was for the same crime or conduct, I find *Curry*

instructive.

In *Curry*, a criminal defendant was held in custody in Washington on both Washington and Oregon charges.  967 P.2d at 523.  The Oregon Court of Appeals determined that he was not entitled to pretrial incarceration credits for the time when "his incarceration was not solely the result of the Oregon charges or the conduct that gave rise to those charges," noting that he "would have remained in custody even if there had been no Oregon charges against him."  *Id.* at 525.  Thus, the defendant only received credit for the time he was held in Washington solely on the basis of the Oregon charges.  *Id.  Curry*'s analysis was based on *Randolph v. Oregon Department of Corrections*, 910 P.2d 1171 (Or. Ct. App. 1996), which held that under ORS § 137.370(4), "credit for time spent in custody between arrest and commencement of sentence under ORS 137.320 is to be given *only* for time spent in custody as the result of the charge or conduct that gave rise to the charge for which the sentence is later imposed."  *Randolph*, 910 P.2d at 1174.

*Randolph* and *Curry* thus help define "the crime" as to subsection (2)(a) and "a crime or conduct that is not directly related to the crime" as to subsection (4).  Time spent in pretrial incarceration counts toward the total sentence when it was "the result of the charge or conduct that gave rise to the charge."  *See Randolph*, 910 P.2d at 1174; Or. Rev. Stat. § 137.370(2)(a).  Conversely, if the time spent is not "the result of the charge or conduct that gave rise to the charge," no credit is awarded.  *See Randolph*, 910 P.2d at 1174; Or. Rev. Stat. § 137.370(4).

In this case, Mr. Davis's federal charge of felon in possession is distinct from his state charge of burglary.  However, the felon in possession charge was a result of conduct that gave rise to his state burglary charges.  As Judge Acosta explained, the relevant weapon was stolen during a string of burglaries committed by Mr. Davis, for which he was eventually charged in

PAGE 4 - OPINION & ORDER

state court.  Thus, under the unusual facts of this case, the distinct federal and states charges arise

from the same conduct.  Mr. Davis should have received credit for time spent in custody between

his arrest and the commencement of his sentence, and the 393 days should not have been added

back onto Mr. Davis's sentence when he was returned to state custody for the remainder of his

concurrent sentence.

Judge Acosta notes that there is testimony in the record that a sentence is the result of

many factors and therefore concludes that there is a genuine issue of material fact regarding

whether or not Mr. Davis's sentence was properly calculated.  However, the State has not argued

that any other statute or regulation required the 393 days be added back onto Mr. Davis's

sentence.  On the record before me, the sole reason for the additional time was ORS § 137.370.

Therefore, I hold that ODOC improperly calculated Mr. Davis's sentence under ORS § 137.370.

## II.    <u>Effect of Settlement Agreement</u>

ODOC's improper calculation does not end the analysis because Mr. Davis may have

waived his right to bring this case in his settlement agreement with the State.

### A.    *Waiver of This Action*

To interpret a contractual provision under Oregon law, a court first "examines the text of

the disputed provision, in the context of the document as a whole."  *Yogman v. Parrott*, 937 P.2d

1019, 1021 (Or. 1997).  "Whether terms of a contract are ambiguous is a question of law.  In the

absence of an ambiguity, the court construes the words of a contract as a matter of law."  *Id.*

(quoting *Eagle Indus., Inc. v. Thompson*, 900 P.2d 475, 479 (Or. 1995)).

Mr. Davis's settlement states in relevant part: "this settlement resolves the dispute

between the parties regarding the sentence calculation in *Davis v. Howton*, CV 05-1830-HU."

(Dingle Aff. (#40) Ex. 22 at 2.)  I hold that this language unambiguously settles the issues raised

in this § 1983 action.[1]  It is suggested that by specifically referencing the case number, the

settlement resolved only the case pending at the time of settlement.  However, the settlement also

indicates that it resolves *the dispute* between the parties stemming from the sentence calculation.

The dispute stemming from the sentence calculation is the basis of the current § 1983 suit.

Limiting the effect of a settlement to the docket number of the pending case rather than the issues

pending in that case, would be unworkable in the general civil context.

It is further suggested that the settlement language should be read narrowly to prevent the

settlement of future claims.  However, this § 1983 action is not a future claim, as such.  In

general, the policy disfavoring settlement of future claims invovles claims based on facts that

have not yet arisen, whereas this case is based on the same facts as *Davis v. Howton* and contains

identical claims, with only a different theory of relief.

## B.    *Validity of Settlement Agreement*

The question remains, however, whether the settlement is valid.  Determining the validity

of a release of significant federal rights, like the right to bring a § 1983 action, is a matter of

federal law.  *Jones v. Taber*, 648 F.2d 1201, 1203 (9th Cir. 1981).  The validity of a release of

claims under § 1983 is determined by a two prong test: (1) whether the release was voluntary and

(2) whether its enforcement is in the public interest.  *Lynch v. City of Alhambra*, 880 U.S. 1122,

1126 (9th Cir. 1989) (citing *Town of Newton v. Rumery*, 480 U.S. 386 (1987)).  The burden of

---

[1] This is not to say that the settlement constitutes an agreement or admission by either party that Mr. Davis's actual release date was proper under ORS § 137.370.  There is no indication that the settlement required any such admission and I will not read it into the agreement.

establishing the validity of a release rests on the party relying on the release. *Jones*, 648 F.2d at

1204. In this case, the burden is on the State.

> ### 1.    Voluntariness

Generally, to be voluntary, the waiver of an important right must be knowing and

intelligent. *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The Ninth Circuit has cited

favorably to Justice O'Connor's concurrence in *Rumery*, describing the following five factors as

relevant to determine whether a release of claims under § 1983 is voluntary:

> (1) the knowledge and experience of the criminal defendant; (2) the circumstances
> of the execution of the release, including whether the defendant had the benefit of
> counsel; (3) the nature of the criminal charges pending; (4) the existence of a
> legitimate criminal justice objective for obtaining the release; and (5) whether the
> agreement was executed under judicial supervision.

*Lynch*, 880 F.2d at 1126 (citing *Rumery*, 480 U.S. at 401-02 (O'Connor, J., concurring)). The

earlier case of *Jones v. Tabor*, contains a similar list of factors to be considered in determining

whether a release of claims under § 1983 is valid, including: (1) the plaintiff's state of mind; (2)

whether the release was executed in a non-coercive atmosphere; (3) whether counsel was present

when the release was executed; and (4) whether criminal proceedings were pending when the

release was executed. 648 F.2d at 1204-05. Application of either of these tests is highly fact

specific.

The State alleges that the agreement was voluntary because Mr. Davis "made a conscious

decision to accept the [sic] May 1, 2006[,] as his release date[,] . . . there was no showing that the

release was executed in a coercive manner," and Mr. Davis was represented by council. (Defs.'

Mem. Summ. J. (#38) 10.) There are at least two problems with this explanation. First, whether

or not Mr. Davis consciously accepted the new release date does not tell the court anything about

the voluntariness of the agreement or about how the State could possibly know the plaintiff's

state of mind.  Second, it is the State, as the party relying on the release, who carries the burden

of proof on this issue; therefore, Mr. Davis has no duty to show the release was executed in a

coercive manner.

Mr. Davis argues that the atmosphere under which he executed the settlement was

coercive.  (Pl.'s Opp. to Summ. J. (#46) 6.)  Mr. Davis was incarcerated when he received the

settlement agreement.  (Davis Aff. (#48) ¶ 2.)  Although he had an attorney, Mr. Davis had never

met him in person and did not speak to him about the settlement, which was sent to Mr. Davis

directly.  (*Id.* ¶¶ 1, 4.)  Finally, Mr. Davis testified that he was under extreme stress when he

entered into the settlement agreement: he believed he had been wrongfully incarcerated for over

nine months, no one at ODOC cared about his predicament, he had lost a job offer lined up for

his original release date, and he might lose custody of his daughter, whom he had just learned

had been sexually abused while in her mother's care.  (*Id.* ¶ 6.)

A genuine dispute of fact exists regarding whether or not Mr. Davis's execution of the

settlement was voluntary and therefore summary judgment is inappropriate.

## 2.    Public Interest

Release or settlement agreements like the one at issue in this case are not against the

public interest, per se.  *Lynch*, 880 F.2d at 1127 (citing *Rumery*, 480 U.S. 386).  In determining

whether the public interest weighs against enforcement of an agreement a court must "(1) []

determine whether the agreement waives a right that impacts upon the public interest; (2)

determine whether a *substantial* public interest would be impaired by enforcement of the

agreement; and (3) [] ascertain the reasons apart from the general interest in settling disputes that

support enforcing the agreement." *United States v. Northrop Corp.*, 59 F.3d 953, 962 (9th Cir.

1995). *Rumery* has indicated that waiver of a suit under § 1983 does impact on the public

interest. 480 U.S. at 395 (availability of release-dismissal agreements may threaten public

interests in vindication of constitutional rights and fair administration of criminal justice).

However, because the right to bring suit under § 1983 is essentially a private right, "the surrender

of th[is] right[] [does] not have a significant impact upon the public at large." *Davies v.

Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1397 (9th Cir. 1991) (citing *Rumery*, 480 U.S.

at 394-95).

"If no substantial public interest would be impaired by the agreement, [courts] must

consider . . . all the factors that bear on whether 'the public interest in enforcement of the

agreement outweigh the policies furthered by non-enforcement.'" *Northrop Corp.*, 59 F.3d at 963

(quoting *Davies*, 930 F.2d at 1396). In conducting this balancing, I keep in mind that "foregoing

a remedy of money damages for a past injury that cannot be undone may not implicate the public

interest to the same extent as does the surrender of the right itself." *Davies*, 930 F.2d at 1397.

In *Rumery*, the plurality stated that "[t]he vindication of constitutional rights and the

exposure of official misconduct" were public interests supporting § 1983 suits. 480 U.S. at 395.

However, the court acknowledged that marginal or frivolous § 1983 suits are against the public

interest because the cost of defending such suits is substantial. *Id.* at 396. Under such

circumstances, settlement is within the discretion granted to the prosecuting authority. *Id.*

Furthermore, in many cases such agreements "reflect a highly rational judgment that the certain

benefits of escaping criminal prosecution [or in this case, being released from prison,] exceed the

speculative benefits of prevailing in a civil action." *Rumery*, 480 U.S. at 394. Thus, such agreements "may further legitimate prosecutorial and public interests." *Id.* at 397.

The State argues that the public interest is served by the settlement in this case, because such agreements defend against marginal and frivolous claims. (Defs.' Mem. Summ. J. (#38) 10.) Mr. Davis contends that his claim is neither weak nor frivolous, therefore, the settlement is not in the public interest. (Pl.'s Opp. to Summ. J. (#46) 7.) However, this argument misstates the public interest somewhat. In a broad sense, there "is a policy favoring enforcement of private agreements and the encouragement of settling litigation." *Davies*, 930 F.2d at 1398 (citing *Kiddie Rides, Inc. v. Southland Eng'g, Inc.*, 361 F.2d 575 (9th Cir. 1966)). This policy exists whether or not the litigation is marginal or frivolous. The Ninth Circuit indicates that the interest in settling litigation is insufficient to carry the day when the public interest favoring nonenforcement is substantial. *Id.* This implies that there are cases where the interest in settling litigation and enforcing private agreements is sufficient. Neither party points to any other public policies aided or injured by enforcement of this settlement agreement.

As the Supreme Court noted in *Rumery*, settlement agreements that "reflect a highly rational judgment that the certain benefits . . . exceed the speculative benefits of prevailing in a civil action," are in the public interest. 480 U.S. at 394. If Mr. Davis's agreement to the settlement was truly voluntary, he weighed the certain benefit of being released from prison before his scheduled release date against the uncertain future benefit of a civil suit, and determined that release from prison was more beneficial. That is a rational decision that is not, in and of itself, against the public interest. Thus, I hold that if Mr. Davis's settlement agreement was entered into voluntarily, its enforcement is in the public interest.

PAGE 10 - OPINION & ORDER

**III.**    ***Heck* and *Nonnette***

If, after further factual inquiry, the settlement agreement is determined to be valid, there is no need to determine whether *Heck*, 512 U.S. 477, prevents Mr. Davis from bringing this claim. If the settlement is determined to be invalid, Judge Acosta properly determined that Mr. Davis can bring this case under the exception recognized in *Nonnette*, 316 F.3d 872.

**CONCLUSION**

Upon review, I agree with Judge Acosta's recommendation as to defendants' Motion for Summary Judgment (#37), which is DENIED.  However, I disagree with his recommendation as to plaintiff's Motion for Partial Summary Judgment (#42), which is GRANTED.

IT IS SO ORDERED.

DATED this  11th  day of August, 2009.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Court

PAGE 11 - OPINION & ORDER